

# SCOTT L. TURNER CONSULTING, LLC

New Jersey

908-496-4273

Tennessee

423-881-5469

## EXPERT REPORT OF SCOTT L. TURNER

*Report Date: February 7th, 2014*

*United States District Court,*
*Eastern District of Arkansas, Eastern Division*

Docket/Case: 3:12CV104-BR W

*Ted Chandler & Martha Chandler*

*Plaintiff*

v.

*Jacob's Engineering Group, Inc.,*

*APAC – Tennessee; and Protection Services, Inc.*

*Defendants*

*"The Finest in Transportation Consulting to the Legal Community"*



EXHIBIT

A



# SCOTT L. TURNER CONSULTING, LLC

P.O. Box 185 • Blairstown, NJ 07825
908-496-4273



Date: February 7th, 2014

Report by: Scott L. Turner

Prepared for: Attorney Frank Day
Leitner, Williams, Dooley & Napolitan, PLLC
Brinkley Plaza, Suite 800
Memphis, Tennessee 38103

Case Caption: Ted Chandler & Martha Chandler v. Jacob's Engineering Group, Inc.,
APAC – Tennessee; and, Protection
Services, Inc.

Jurisdiction: United States District Court, Eastern District of Arkansas, Eastern Division

Cause/Case/Docket Number: 3:12CV104-BRW

## General Information:

Date & Time of Crash/Loss: Tuesday, January 18, 2011 / approximately 5:48AM

Location of Crash/Loss: Interstate 40 Westbound, West Memphis, Arkansas,
MP 281.6, immediately off Interstate in median stopping just
short of crossing Highway 131 that ran North/South underneath
I-40.

Equipment Involved: 2005 International 9200, VIN #2HSCESBR95C051058

Weather Conditions: Wet roadway surface resultant from heavy fog overlay.

Natural Lighting Conditions: Dark

Artificial Lighting Conditions: None

*"The Finest in Transportation Consulting to the Legal Community"*

1

<u>1.0 Persons and Organizations:</u>

➢ Teddy E. Chandler (hereinafter "Chandler"); Chandler was the driver/operator of the Commercial Motor Vehicle bobtail tractor that was the tractor of the subject crash.

➢ Trooper Shane William Meyer (hereinafter "Trooper Meyer"); Trooper Meyer was then a veteran of law enforcement since November, 1992. In addition to Trooper Meyer's law enforcement, he was also trained for 3-weeks in a specialized course in accident investigation, and was mentored in accident reconstruction techniques and details by superiors. Trooper Meyer has patrolled the area of the crash for 9-months preceding the crash. Trooper Meyer was the investigating officer to the subject crash.

➢ Paul Jeffrey Adams (hereinafter "Adams"); Adams was employed by the Arkansas Highway & Transportation Department as the Resident Engineer responsible for the 1-40 "project" (#110492). Adam's is a 20-year employee of AHTD at the time of October, 2012.

➢ James Smith (hereinafter "Smith"); Smith is a 12-year employee with APAC as a Civil Engineer.

➢ John Alford (hereinafter "Alford"); Alford was then a Traffic Control Supervisor for APAC.

➢ Max Watson (hereinafter "Watson"); Watson is in Project Management at APAC.

➢ Intermodal Cartage Company (hereinafter "ICC"); ICC is a motor carrier that for the purposes of this crash was the motor carrier of record that Chandler was leased to. The FMCSR regulates Chandler as an employee of ICC.

➢ APAC (hereinafter "APAC"); APAC is a heavy highway construction contractor that is a Defendant in this action.

<u>2.0 Abbreviations and Acronyms:</u>

➢ USDOT -- United States Department of Transportation
➢ 49 CFR -- USDOT, Code of Federal Regulations
➢ FMCSA -- Federal Motor Carrier Safety Administration
➢ FMCSR -- Federal Motor Carrier Safety Regulations
➢ NTSB -- National Transportation Safety Board
➢ MUTCD -- Manual on Uniform Traffic Control Devices; FHWA
➢ NATMI -- North American Transportation Management Institute
➢ LTCCS -- Large Truck Crash Causation Study
➢ AHTD -- Arkansas Highway & Transportation Department
➢ FHWA -- Federal Highway Administration; USDOT
➢ NHTSA -- National Highway Traffic Safety Administration
➢ NTSC -- National Traffic Safety Council
➢ ROR -- Run Off-Road Crashes
➢ CMV -- Commercial Motor Vehicle
➢ ECM -- Electronic Control Module
➢ RODS -- Record of Duty Status

2

> ➤ CDL -- Commercial Driver's License
> ➤ TCP -- Traffic Control Plan
> ➤ FPS -- Feet Per Second
> ➤ MP -- Mile Post
> ➤ ME -- Medical Examiner

**3.0 General Description:**

The area of the subject crash was an area of Interstate 40, MP 281.6 westbound that was undergoing a significant highway improvement project that was being performed by APAC, one of the defendants to the pending lawsuit.

Although it is non significant or relative to the crash, the specific type of work being performed was, but not limited to concrete joint repair work that called for the two right lanes to be closed. This work was final "punch list" type work to conclude the contract.

The westbound Interstate section that is subject to this crash is a 3-lane westbound direction highway. The 3-highway lanes are delineated by white skip lines indicating passing zones. The south side of the subject area of highway is bordered by a yellow fogline and the north side of the highway is bordered by a white solid fogline. Witnesses report that the south side of the subject area was purported to have rumble strips just beyond and parallel to the yellow fogline, off the travel portion of the roadway.

The east and west lanes of I-40 are divided by either concrete Jersey barriers or "W" type guardrails. The specific area preceding the subject crash that was separating the eastbound from westbound lanes was protected by "W" type guardrails.

AHTD traffic count data indicate that I-40 both eastbound and westbound are high traffic volume roadways based on volume. Studies determined that daily traffic volume for the both east and westbound highways were collectively well in excess of 30,000 vehicles per day. Per year, this volume is estimated well in excess of 11 million vehicles annually. Of the data realized, a significant amount of this volume is CMV traffic traveling through the advanced warning area daily, as this is a major freight corridor.

The area of highway whereupon the CMV of Chandler ran off the road was constructed of concrete and had a clearly visible yellow fogline with rumble strips. In addition, the area was controlled as to traffic flow by means of MUTCD methodologies and regulations. The specific area of construction inclusive of the highway advisory signage was in place for a considerable time span prior to the crash, for at least 9 months prior based on Trooper Meyer's tenure on this section of highway.

As testified to by Chandler, he was well familiar with this section of Interstate Highway as he travels it *"numerous times"* (TC; 147:20) in route to Union Pacific in Marion, Arkansas. In addition, Discovery evidence supports this; therefore, he was well aware of the approaching construction area.

3

Crossing the solid yellow line and rumble strips, Chandler traveled off the highway into the center median area. The bobtail tractor eventually came to rest near the bridge overpass of highway 40 near the north/south cross section underpass of highway 131, after crashing over an embankment located in the median.

The location where construction work was actually taking place on Interstate 40 was located west of the location were Chandler's CMV had left the travel lanes of the Interstate.

### 4.0 Introduction and History:

At the time of the incident Chandler was a 53-year old male, CDL issued professional commercial motor vehicle driver/operator. He obtained his CDL-A approximately in the year of 2002, issued by the State of Mississippi. Chandler's CDL was obtained through Ace Training School in Jackson, Mississippi, said course extended from May 2002 – July 2002.

While traveling through a heavy highway construction zone on Interstate 40 westbound, Chandler for reasons uncertain operated his CMV off the travel portion of the highway. The construction zone and advanced warning area was under the contracted management of APAC.

APAC is predominantly a southeast region highway and construction contractor. On any given highway construction project that is performed by APAC, they consistently maintained multiple MUTCD certified personnel. However, the ultimate person responsible for the overall traffic control implementation and maintenance is the Traffic Control Supervisor, and is an obligated pay item in the contract. On this subject project, Alford was the Traffic Control Supervisor.

For approximately two miles prior to the construction zone, substantial highway advanced warning advisory signs were in use to advise westbound traffic as to what to expect downstream. The warning signs and devices included, but were not limited to: temporary traffic control signs (48"X 48" orange) mounted on Windmasters (or alike); illuminated arrow boards (2); single direction large arrows (48"X 24" orange), large traffic advisory message boards and reflective orange/white drums (traffic control devices) for traffic channeling purposes.

By observation of videos taken by traffic control personnel of APAC and photos taken by CIA, all signage appeared to be in compliance with the standards set forth in the MUTCD including size, placement and maintenance. Maintenance in accordance with 6F.04 of the MUTCD and placement (set up) in accordance with TA-37 of the MUTCD. According to Adams, "..., *there's standard drawings that you follow that's based on the MUTCD*". (PJA; 11:10)

4

Chandler testified that the weather conditions prior to the time of the accident was fog in the area of the construction zone. Trooper Meyer who responded to the accident shortly after receiving notice of the accident testified that the road surface was wet but that there was no precipitation and it was *"clear"*. Chandler stated in deposition testimony as to the following: *"But as far as an overall descriptions, it was wet, dark, precipatory morning".* (TC; 160:5); and: *"... You can just say wet dark and foggy".* (TC; 159:15); and: *"Yes, As I mentioned, poor visibility".* (TC; 269:6)

### 5.0 Document Examination:

### 5.1 MUTCD and Traffic Control Plan-

The purpose of the MUTCD, the Manual on Uniform Traffic Control Devices, of which is incorporated by reference in the OSHA § 1926 standard, is to create a uniform continuity as to traffic control measures during highway and road construction nationwide. Therefore, a motorist can expect somewhat similar warning systems in Tennessee, Arkansas or Idaho (Nationwide) on approach to lane closures, shoulder closures or other temporary modifications or diversions in normal traffic patterns, hence the term "uniform". This was also intended to decrease the number of construction zone crashes thereby injuring workers and/or worker fatalities, hence the OSHA adoption of the MUTCD into §1926.

It will be noted in the reference area below that there are MUTCD 2003 Edition -- 2009 Edition. It is not certain which plan was utilized during the engineering process for bid by Carter Burgess, therefore both had been consulted and researched, they are consistent with no changes specific to matters concerning Advanced Warning Area on this project.

The original TCP for the subject I-40 site was designed by Carter Burgess engineering firm as a bid item for the then proposed highway construction project. The site specific TCP would have been in detail developed by the foundation of the MUTCD. Regardless what TCP was being utilized -- original or a modified version -- the TCP demonstrated in available video footage met the MUTCD requirements.

On a periodic basis, APAC traffic control personnel would perform drive along video documentation whereas they would video the entire project, inclusive of the Advance Warning Area through to the Termination Area. The video would consist of signage and devices (traffic control devices) from a moving vehicle. The purpose of this type of effort was to video document compliance with proper MUTCD requirements, and compliance with the site TCP plan of which would naturally follow the MUTCD.

From the videos provided to the undersigned, of which the undersigned was advised have all been produced during the course of discovery, the undersigned confirmed that the advanced warning area was in compliance with the MUTCD.

5

There are three notable variations noted by the undersigned comparing pre-crash conditions as reported by testimony and observations by the undersigned from the video footage on the footage of 1/9/2011 5:02PM, of which serves as on exemplar of set up of the Advanced Warning Area ; #1, It was dark on the early morning hours of the crash whereas it was daylight during the video shoot, #2, The road surface was wet on the early morning hours of the crash whereas it appears dry during the video shoot, #3, This next point is alleged but not proven to the undersigned based on received documents for review. There was damage to the W-beam end terminal crash attenuator, with one safety barrel and two non-reflective collar cones (CIA photo 1/21/2011 [note: there is snow on the shoulder surfaces in photos of which was not present on the morning of the crash or in the video of 1/9/2011 5:02PM]), The video demonstrates damage to the W-beam system had not yet occurred.

The testimony I have reviewed states that the W-beam end terminal crash attenuator was not part of the project and that it was the responsibility of AHTD to maintain the W-bean guardrail at issue.

The proper MUTCD plan that would have been used as the basis of the design for the advanced warning area for this particular lane closures is the Typical Application 37, or TA-37:

-INTENTIONALLY LEFT BLANK-



**MUTCD 2003 Edition**

There is one additional notable enhancement application to the plan utilized on "the project" that is not required in TA-37 above. In each of the two tapers it can be noted by observing video footage from 1/9/2011 5:02PM, APAC installed three bright safety orange left directional 48"X 24" on a Windmaster type system, three for each taper for a total of six. This is an additional safety item incorporated to properly direct traffic from the closed lanes to the required lane of travel. Clearly, Chandler understood this by his numerous successful and safe trips through this Advanced Warning Area and his written statement of his version of the crash: ".... *Flashing arrow sign on right side of road appeared. I had to merge to far left lane because of lane closure. All other lanes closed except for far left lane*".

7



The second set of 48"X 24" (most westerly) safety orange arrows located in the second taper after the illuminated arrowboard were in direct headlight view had Chandler been in either of the two available lanes of which the right lane was being directed to channel left.

Again, at the risk of redundancy, however a critical point; in a hand written statement by Chandler to a "Leslie" on February 4th, 2011, Chandler seems to have a recollection that conflicts with his later deposition testimony of May 3rd, 2013. In this post crash statement, Chandler states the following; ".... *Flashing arrow sign on right side of road appeared, I had to merge to far left lane because of lane closure. All other lanes closed except for far left lane*".

It is testified by Trooper Meyer that after the crash he traveled the approximate path of travel of Chandler on I-40 pre-crash through the Advanced Warning Area to observe all message advisory boards, safety devices and signs (Traffic Control Devices) in order to determine if there was any contributory factors as to the crash, he found none. Trooper Meyer states the following; Q: *"Okay. Now, based on having driven through the area as part of your investigation, did you make any findings about whether or not the traffic control devices being used in the area were functioning properly?"* A: *"Yes, sir"*. Q: *"And what did you determine?"* A: *"Everything was correct. Everything was functioning properly"*. (SWM; 39:21)

Throughout deposition testimony Chandler consistently suggests that it was *"poor visibility" and "rain"* that caused him to be incapable of effectively seeing the signage in the advanced warning area that was causative to his crash, ironically there was one such sign nearly immediately after the on-ramp for the Arkansas State Police Scalehouse. This sign was in both plain and clear view for exiting off I-40 CMV traffic into the scalehouse. At this point in travel Chandler would have been traveling considerably slow decelerating

8

on approach to the scalehouse. Here Chandler would have seen the large illuminated sign to his left that states the "Right Lane's Closed, 2 Miles – Be Prepared to Stop".

Upon egress of the scalehouse, again, Chandler would have seen another 48"X 48" orange sign indicating "Road Work Ahead"; this too would have been approached slowly and in plain view as he is accelerating as he exited from the scalehouse.

It is highly likely that Chandler frequented this scalehouse based on the fact that he traveled this route on a relatively regular basis. Therefore, Chandler had multiple opportunities to view these advisories on a regular basis, at slow speeds entering and exiting the scalehouse.

Chandler consistently suggests to the issue of signage obscurity due to the fog, however, in deposition testimony Chandler states the following regarding the scalehouse sign: *Q: "Okay. Now, as you are approaching the weight station, the scales - -" A: "Yes, sir." Q: ".. - on I-40 West, as you're coming into Arkansas, did you see the signs for the weight station?" A: "Was the weigh station lit up and did I see the signs?" Q: "I'm just asking, did you see the signs for the weight station as you were approaching it?" A: "Yes, sir."* (TC; 170:16).

The lettering on the illuminated "OPEN" sign for the scalehouse comparatively speaking to the flashing illuminated advisory board as stated above was considerably smaller as to lettering, empirically speaking. The advisory board lettering appears much larger. In addition, the overall size of the advisory board was substantially larger. Again, Chandler has observed these "OPEN" or "CLOSED" scalehouse signs on numerous occasions, thereby providing him multiple opportunities to view the message advisory signs and orange "Road Work Ahead" sign.

Chandler states that he was able to see the "OPEN" scalehouse sign, but he suggests the substantially larger signs used in the advanced warning area were obscured.


## 5.2 FMCSA Regulations-


### 5.2.1 Ignorance of the FMCSR-

The following regulation applies to all persons driving/operating commercial motor vehicles in interstate commerce:

> ➤ *§ 390.3 General applicability. (e) Knowledge of and compliance with the regulations.(2) Every driver and employee shall be instructed regarding, and shall comply with, all applicable regulations contained in this subchapter.*

### 5.2.2 Driving In Hazardous Conditions.

Chandler is correct in his one statement during testimony whereas he states the following regarding impairing weather conditions and the actions that should be taken by a CMV driver; *A: "If I was not able to determine where the lanes were, common sense would have said you would shut yourself down"* (TC; 179:17).

Chandler may be accurate in his testimony with respect with what a CMV driver is supposed to do in severely inclement weather such as visual impairing fog, based on the questionable weather conditions that he stated to have encountered. However, he did not follow his own logic and the FMCSR. Chandler should have immediately removed himself from the roadway if in fact the weather was such that it interfered with his ability to safely operate his CMV. One such place of safe refuge would have been to remain at the scalehouse if he were concerned with weather that potentially compromised safety.

Although inconsistent with the testimony of Trooper Meyer, Chandler further testifies about the weather conditions as follows; *Q: "Okay. So you couldn't see the lane markings painted on the roadway?" A: "Hard to see."* (TC; 178:2). With respect to the safety orange signs, Chandler further testifies as to his inability to clearly see the 48"X 48" signs while behind the wheel of his CMV; *"Unless it was reflective, it would have been very hard to see."* (TC; 180:9).

If in fact a CMV driver encounters severe fog whereas he/she is unable to detect safety devices such as roadway lines that delineate travel lanes or highway advisory signs, he/she would be obligated to apply the following FMCSA Regulation:

> ➢ *§ 392.14 Hazardous conditions; extreme caution. Extreme caution in the operation of a commercial motor vehicle shall be exercised when hazardous conditions, such as those caused by snow, ice, sleet, fog, mist, rain, dust, or smoke, adversely affect visibility or traction. Speed shall be reduced when such conditions exist. If conditions become sufficiently dangerous, the operation of the commercial motor vehicle shall be discontinued and shall not be resumed until the commercial motor vehicle can be safely operated. .....*

Chandler suggests throughout his deposition, in conflict with Trooper Meyer's report and sworn testimony that the foggy weather conditions severely affected his *"visibility"*. Trooper Meyer, an officer substantially experienced in crash investigation and aware of the need to assess and consider environmental and/or weather conditions at the scene of a crash reported the weather as *"clear"* and *"wet"*.

Again, Chandler acknowledges that he was able to see small illuminated sign(s) that state "OPEN" for the scalehouses based on his actions of entering the scalehouse. However, he somehow missed the large illuminated advisory boards. One of which states: "RIGHT LANE CLOSED 2 MILES -- BE PREPARED TO STOP", alternating messages. Yet another illuminated sign stating "DRIVE SAFELY -- BUCKLE UP", alternating

10

messages, with construction barrels in the area of the sign. A clear indicator to the aware CMV driver.

These are followed by yet two illuminated arrowboards at the taper that clearly indicate to a motorist to merge left at each taper. This set up is something that a professional driver encounters on a regular basis, often daily. Chandler's testimony that he believed that the arrowboards were signalling for him to leave the designated travel portion of the roadway at a point where two full lanes of travel remained open, later tapering down to one lane, causes the undersigned to question the explanation offered by Chandler. For Chandler to suggest that he believes that he was going to be forced onto a muddy/gravel detour from a high volume Interstate is unheard of for a professional CMV driver. He states in testimony as to the following: *"At that particular time, with the road surface being wet and visibility being lessened, I was just thankful that I wasn't being pushed off onto a muddy gravel detour again"*. (TC; 252:18)

### 5.2.3 CMV Driver Required Knowledge-

In the examination, and during the road test phase of the CDL test, the applicant CDL driver must both demonstrate knowledge of various aspects of the FMCSR and a road test. Specifically, the candidate must demonstrate knowledge, but not limited to that of 49 CFR 383.111, although Part 383.111 is critical knowledge in the undersigned's opinion.

In this specific regulation, it is required by the driver to understand twenty general areas of the "Required Knowledge" regulation. They are as follows:

> *§ 383.111Required knowledge. (a) All CMV operators must have knowledge of the following 20 general areas:*

1. *Safe Operations Regulations;*
2. *Safe Vehicle Control Systems;*
3. *CMV Safety Control Systems;*
4. *Basic Control;*
5. *Shifting;*
6. *Backing;*
7. *Visual Search;*
8. *Communication;*
9. *Speed Management;*
10. *Space Management;*
11. *Night Operations;*
12. *Extreme Driving Conditions;*
13. *Hazard Perceptions;*
14. *Emergency Maneuvers;*
15. *Skid Control and Recovery;*
16. *Relationship of Cargo to Vehicle Control;*
17. *Vehicle Inspections;*

11

*18. Hazardous Materials;*
*19. Mountain Driving;*
*20. Fatigue and Awareness*

It should be noted that even if a CMV driver has had his CDL for an extended period of time such as Chandler in this case, it is still incumbent upon the driver to be aware of the current Regulations. It is further incumbent upon his employer, in this case Intermodal Cartage Company, Inc. to ensure their driver/employees have this knowledge, regardless if they are independent owner-operators or company drivers. See § 390.3 (e)(2); and, § 390.5 "Employee".

The following coincide with the parts of the Required Knowledge that the undersigned believe that Chandler failed to apply, of which were causative to the crash:

➢ *§ 383.111 Required knowledge. (a) All CMV operators must have knowledge of the following 20 general areas:*
  o *(1) Safe operations regulations. Driver-related elements of the regulations contained in parts 391, 392, 393, 395, 396, and 397 of this subchapter, such as:*
    ▪ *(ii) Procedures for safe vehicle operations;*
    ▪ *(iii) The effects of fatigue, poor vision, hearing impairment, and general health upon safe commercial motor vehicle operation;*
  o *(3) CMV safety control systems.*
    ▪ *(ii) CMV drivers must have knowledge of the correct procedures needed to use these safety systems in an emergency situation, e.g., skids and loss of brakes.*
  o *(7) Visual search. The importance of proper visual search, and proper visual search methods, including:*
    ▪ *(i) Seeing ahead and to the sides;*
  o *(9) Speed management. The importance of understanding the effects of speed, including:*
    ▪ *(i) Speed and stopping distance;*
    ▪ *(ii) Speed and surface conditions;*
    ▪ *(iii) Speed and the shape of the road;*
    ▪ *(iv) Speed and visibility;*
  o *(11) Night operation. Preparations and procedures for night driving, including:*
    ▪ *(i) Night driving factors, e.g., driver factors (vision, glare, fatigue, inexperience);*
    ▪ *(ii) Roadway factors (low illumination, variation in illumination, unfamiliarity with roads, other road users, especially drivers exhibiting erratic or improper driving); and*
    ▪ *(iii) Vehicle factors (headlights, auxiliary lights, turn signals, windshields and mirrors).*

12

- o  *(12) Extreme driving conditions. The basic information on operating in extreme driving conditions and the hazards encountered in such conditions, including:*
  - *(i) Bad weather, e.g., snow, ice, sleet, high wind;*
- o  *(13) Hazard perceptions. The basic information on hazard perception and clues for recognition of hazards, including:*
  - *(i) Road characteristics;*
- o  *(14) Emergency maneuvers. The basic information concerning when and how to make emergency maneuvers, including:*
  - *(i) Evasive steering;*
  - *(ii) Emergency stop;*
  - *(iii) Off road recovery;*
- o  *(20) Fatigue and awareness. Practices that are important to staying alert and safe while driving, including:*
  - *(i) Being prepared to drive;*
  - *(ii) What to do when driving to avoid fatigue;*
  - *(iii) What to do when sleepy while driving; and*
  - *(iv) What to do when becoming ill while driving.*

Of the 20 points of Required Knowledge of a CMV driver, the undersigned concludes that Chandler violated eight of the 20, and possibly nine of the 20. If he had in fact applied these 20 points of "Required Knowledge", the undersigned is confident that this crash would never have occurred.

By way of violating eight of 20 points of required knowledge while operating a CMV, Chandler unnecessarily caused the risk of life and safety to not only himself, he also caused the same to other motorists.

## 5.2.4 Ill and/or Fatigued Driving.

Based on responding to and or investigating in excess of 1,200 CMV crashes, and consulting as an expert in many CMV crashes, the undersigned has never examined a crash that has no application of brakes or evidence of a hard brake application that was not caused, in whole or in part, by inattentive driving, an ill CMV driver, or because of driver fatigue.. Accordingly, these issues will be considered.

If in fact Chandler was either ill or fatigued, he not only placed himself at risk, he also carelessly endangered the rights and safety of other motorists, and therefore should have parked his CMV or never had left his point of origin. The undersigned acknowledges that such conclusions cannot be drawn from testimony at this point, but the nature of the accident itself makes it necessary to consider such an explanation.

When a driver does not receive proper rest, it is fact that he/she will become fatigued; thereby suffering from diminished mental acuity, cognitive skills and often, poor

13

decision-making. In cases where a driver is subjected to sleep deprivation, there are specific hours within a 24 hour cycle as to which an individual will likely suffer from increased fatigued known as the Circadian Rhythm.

The FMCSR states the following as to a motor carrier's obligation regarding ill or fatigued drivers:

- **49 CFR 392.3 Ill or Fatigued operator-** *No driver shall operate a commercial motor vehicle, and a motor carrier shall not require or permit a driver to operate a commercial motor vehicle, while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, ......*

The FMCSA states and/or suggests the following as to proper rest:

- *Be sure to get an adequate amount of sleep each night. If possible, do not drive while your body is naturally drowsy, between the hours of 12 a.m. to 6 a.m. and 2 p.m. to 4 p.m. Driver drowsiness may impair a driver's response time to potential hazards, increasing the chances of being in a crash.*
- *The circadian rhythm refers to the wake/sleep cycle that our body goes through each day and night. The cycle involves our internal clock and controls the daily pattern of alertness in a human body. With inadequate sleep, the drowsiness experienced during natural "lulls" can be even stronger and may have a greater adverse effect on a driver's performance and alertness.*
- *A study by the Federal Motor Carrier Safety Administration (FMCSA) found that driver alertness was related to "time-of-day" more so than "time-on-task". Most people are less alert at night, especially after midnight. This drowsiness may be enhanced if you have been on the road for an extended period of time.*



Source: EyeAlert

14

This is actual PERCLOS data from a truck driver on the PA Turnpike driving between midnight and 4:00AM. Numbers in vertical column represent percentage of eye closure. Errors in judgment and observation will be encountered especially if one had not rested as prescribed by the FMCSR part 395.

It is understood that this crash occurred at approximately 5:48AM, however, evidence indicates that Chandler started his CMV at 4:45AM on the morning of the crash. It is undetermined what time he awoke on the morning of the crash. Additionally, depending upon what he did regarding rest prior to the day of the crash may be evidence supporting fatigued driving.

This information is offered based on this crashes examination, the undersigned can only conclude on of three reasons as to why Chandler could have run his CMV off the travel portion of I-40. These are: fatigued driving, inattentive driving or driving while ill. These combined with driving to fast for conditions.

### 5.2.5 Medical-

What is commonly referred to as a "DOT Physical" is required by all CDL-A drivers. As part of the DOT physical, the attending physician will review a form with questions as to the driver applicant's medical history. It is vitally important that the driver applicant fill the forms out correctly and accurately in so that the ME can correctly and accurately assess the driver applicant's health qualifications and fitness to drive a potentially 80,000# CMV.

In the comparison of the medical questionnaire as filled out by Chandler there exists a number of inconsistencies that rise to the level of significant concern.

Addressing the latest physical Health History questionnaire of September 28th, 2010, Chandler checks off as "no" for the following boxes with potential inaccuracies:

➢ *Eye disorders or impaired vision (except corrective lenses)*
➢ *Heart disease or heart attack; other cardiovascular condition; medication:* _____

If Chandler checked off "yes" he would have had to reveal in greater specificity the information to assist the ME in making his determination for fitness to drive a CMV.

In deposition testimony Chandler states the following: *Q: "Do you recall around that period of time having a condition with your left eye that you described as impairing your vision to the point where it appeared as if you were staring through a shower stall door?" A: "I believe that comment was taken from my files of the Vitreoretinal Foundation here in Memphis, Tennessee, after various tests and substances that we had been injected with to determine exactly why I was there."* (TC; 308:11). Without further

15

evidence, this is an issue that may be of concern whereas the ME should have been informed.

Further Chandler testifies as to the following regarding his high blood pressure. *"Okay. Daily I take Metformin and Lotrel, Metformin for the diabetes, and, of course, Lotrel for the aforementioned blood pressure. ...."* (TC; 400:22). It is important to note that Chandler did not check off "yes", nor did he list the hypertension medication Lotrel on the form.

CMV drivers that have hypertension disorder concerns and taking medications may be considered for more aggressive and more frequent monitoring by the ME based on the ME's opinion.

### 5.2.6 Crash Preventability-

There are numerous definitions as to the prevention of crashes by CMV drivers. The FMCSA offers one such definition as such:

> ➢ *§ 385.3 Definitions and acronyms. Preventable accident on the part of a motor carrier means an accident (1) that involved a commercial motor vehicle, and (2) that could have been averted but for an act, or failure to act, by the motor carrier or the driver.*

Depending on the actual facts of what occurred at or about 5:48AM on the 18th of January, 2011 is dependent on the actual "act" or "failure to act" – or a combination thereof – that occurred causing Chandler to leave the travel lanes of the road surface. That would be the determining factor as to causation according to the FMCSR.

Further, NATMI states: *NATMI, Preventability of Accidents -- "The decision of preventability should always be made solely on the basis of what the company driver did or did not reasonably do to prevent the accident.".*

In addition to the FMCSR definition of a preventable accident and NATMI's definition, Chandler's employer has likewise ruled this crash as "preventable/avoidable" on Chandler's part on February 7th, 2011.

There were no other vehicles involved in the subject crash. Therefore, with all regulations, industry standards of care and Chandler's employer identified this crash as "preventable" based on its investigation, and this conclusion is consistent with all regulations and the standards of care applicable to professional drivers. A CMV driver who runs off the road without third party interference under circumstances as established by the evidence reviewed by the undersigned, has nobody to blame for the crash but himself/herself as it was he/she who "failed to act" by observing the proper Advanced Warning Area.

16

There are two additional organizations that opine on how a "preventable accident" is defined, they are the NTSC and ICC, Chandler's employer. The opinions are as such:

> NTSC: *"Any accident in which the driver failed to do everything they reasonably could have done to avoid it."*
> ICC: *"If there is something the driver could have done, should have done or should not have done to avert the accident from occurring, then it is a preventable accident."*

ICC has further training of their drivers both company drivers as well as owner operators that speaks to driving in construction zones. They specify *"3 crash prevention tips for these work zones":*

> *"Before the construction zone – Watch closely for speeding motorists who may cut in front of you. Be prepared to make room for them. Carefully read warning signs for instruction on which lane to drive in and at what speed."*
> *"Inside the construction zone – Maintain proper following distances watching ahead for sudden slow down areas and workers/equipment."*
> *"After the construction zone – Watch out for impatient motorists that may quickly change lanes and pass without warning. Be patient and accelerate at your own pace."*

According to records, Chandler was part of this training as included syllabus of his Driver Orientation Program.

In addition to the Driver Orientation Training at ICC, Chandler has also received driver safety training from former employers.

A study by NHTSA conducted in July of 2011 titled "Run Off-Road Crashes: An On-Scene Perspective" states the following:

> *The results show that over 95 percent of the critical reasons for single-vehicle ROR crashes were driver-related. The most frequently occurring category of critical reasons attributed to drivers was driver performance errors (27.7%) such as "overcompensation" and "poor directional control.," followed by driver decision errors (25.4%) such as "too fast for curve" and "too fast for conditions," critical non-performance errors (22.5%) such as "sleeping" and "heart attack/other physical impairment," and recognition errors (19.8%) such as "internal distractions" and "external distractions."*

**5.2.7 Inattentive Driving-**

Again, experience of the undersigned demonstrates that often the absence of braking evidence resultant from a pre-crash hard brake application often is caused by inattentive

17

driving. As such, and FMCSA recognizing this as a significant problem in the commercial motor carrier industry and has published the following:

> *Distraction can be defined as any time a driver diverts his/her attention from the driving task. This may include external distractions, such as looking out the window at a passing building, street sign, or person, or internal distractions, such as talking on a cell phone, eating, reading, or adjusting the radio. The Large Truck Crash Causation Study (LTCCS) reported that 8 percent of large-truck crashes occurred when Commercial Motor Vehicle (CMV) drivers were externally distracted and 2 percent of large truck crashes occurred when the driver was internally distracted*
>  o *Did You Know? A study published in April 2006 found that driver inattention was the leading factor in crashes and near crashes. The study reports that nearly 80 percent of crashes involved some form of driver inattention within 3 seconds before the incident.*
>  o *Did You Know? Inattention or other mental activities distracting you from driving can cause you to gaze blindly at the road and/or objects ahead without actually seeing/recognizing them because your attention is focused somewhere else.*

As to skid evidence, Trooper Meyer states the following in deposition testimony; *Q: "Where did you look for skid marks? A: I looked - - where this accident occurred, there's a dropoff, like an embankment. But prior - - prior to that, I went back up onto the interstate and -- where you exit off I-40/281. I went back up onto the interstate to check and see if I could find any kind of skid marks up there where the gentlemen had left the roadway, and I did not find any".* (SWM; 32:24)

Distracted driving is a very serious problem on today's roads. All too often a CMV driver may fall prey to the temptations to interact with one of many available distractions in the cab of his CMV causing irreversible and often tragic consequences.

### 5.3 Too Fast For Conditions-

*"The number one reason for extreme weather crashes is driving too fast for conditions. Controlling your speed is always vital -- in extreme weather conditions it is especially important. ".* This is statement is on page 16 of the ICC Driver Safety Manual.

It has not been absolutely determined that speed was a contributing factor to the subject crash as there is no substantial evidence indicating as such. However, the following will substantiate the probability that speed was in fact a contributing factor.

In a memo dated Thursday, January 27, 2011 from one Mr. Kelly Peeks of ILS, he states the following as to speed: *"His average speed was 62-63 MPH at point of it dropping to 27 MPH and then to nothing more. Something happened that severed the system quickly*

18

*(like an impact at the 27 MPH causing the tractor to stop) so it did not give me the normal data of 30 seconds after an accident".*

Without the benefit of examining the data such as ETOG, ECM data or PeopleNet as in this crash, it is difficult to opine with certainty as to a driver's speeds through the crash sequences. However, based on common logic and experience it is highly unlikely that Chandler was operating his CMV at 27 MPH unless he was subjected to a medical condition causing his inattention and inability to respond, or he simply fell asleep behind the wheel. It is more likely he was operating his CMV at the *"62-63 MPH"* speed while still on the travel portion of the roadway surface.

It is most likely that the recorded speed of 27 MPH occurred at the point of the crash with the damage causing the PeopleNet equipment to fail. As stated from Peeks: *"like an impact at the 27 MPH causing the tractor to stop".*

For examination purposes only, the undersigned will assume a 27 MPH speed as Chandler's CMV left the travel portion of the interstate.

At the speed of 27 MPH Chandler would be traveling at 40 FPS. It is estimated that Chandler was traveling off the road surface for in excess of 500 linear feet, likely closer to 600 linear feet. If the low-end estimate of 500 linear feet is utilized that would have provided Chandler nearly 13 seconds to bring his bobtail CMV to a stop.

There are several factors when considering stopping distance; alertness, health, mental acuity, reaction time and CMV airbrake lag time. The time considered for calculation purposes from perception of the hazard to reaction to the hazard is 1.5 seconds. The mechanical lag time in a CMV for the airbrakes to fully engage once the foot treadle is applied is .5 seconds. The reason this lag time exists, it takes a literal split second for the air pressure in the CMV to convert to energy to apply the brake shoes to the drum. Then there is the CMV weight factor for consideration to stopping distance.

Chandler being an experienced "professional" CMV driver should know that a bobtail tractor (without semi-trailer) is far greater to lose traction during a brake application due to the absence of downward pressure of weight on the fifth wheel from a semi-trailer. Therefore, he should have applied professional CMV driver logic and training and reduced his speed substantially to the conditions such as rain and his claim to "fog", at a bare minimum, the wet road surface.

Backing out the 1.5 seconds to perception to reaction, then backing out .5 seconds due to lag time leaves Chandler 11 seconds to bring his CMV to a full stop. Therefore, a 27 MPH speed is a completely unreasonable estimate to consider. Again, it is more likely in the 60 plus MPH range as reported on Mr. Kelly Peeks memo. The speed limit in the construction zone is posted at 50 MPH.

19

*"The purpose of any speed limit sign is to inform drivers of the maximum acceptable and safe speed for normal travel conditions"*, this is according to the FHWA document "Guidelines for the Use of Variable Speed Limit Systems in Wet Weather".

FHWA further states: *"As appropriate design speeds and maximum safe speeds are determined for a given roadway segment, it is important that the relationship between sight distance and stopping distance is also considered. A driver must be able to see the roadway ahead and have adequate time to come to a complete stop when required"*.

Chandler testifies to his perception of speed; *A: "..., my last recorded speed was 27 miles an hour." Q: "Okay." A: "According to what the report read." Q: "And do you believe that the speeds noted on that report are accurate?" A: "Up until the time of the accident itself when it says that I quit transmitting, according to the report, I don't see any reason to contradict it." Q: "Okay. So if - -" A: "I don't know enough to raise a contradiction, but I see no reason why it should have been inaccurate up until that point."* (TC; 200;12)

### 5.4 Defensive Driver Training-

After review of Discovery documents submitted by ICC, it appears that the driver training conducted on September 30th, 2010 was relatively substantial from an empirical opinion.

Inclusive of the "Owner Operator Drivers, Orientation Safety Training" was a 2-hour training program detailing the Smith-System Defensive Driver training.

The Smith-System is arguably the premier defensive driver-training program in the North America, if not the world. Simply, had Chandler incorporated his teachings into his daily driving habits, this accident would not have occurred.

The Smith-System trains as to the following methodology. There are five primary key elements in the driver training. In these five primary key elements, there are sub-elements; they are as follows:

Key #1: Aim High In Steering
- Eyes lead the vehicle properly.
- Sees and evaluates relevant objects from among distant objects.
- Adjusts eye lead distance to speed.
- Keeps vehicle rolling by adjusting for conditions.
- Eyes properly elevated around turns and corners

Key #2: Get The Big Picture
- Following distance consistently appropriate for conditions.
- Makes and executes decisions early.
- Avoids being unnecessarily boxed in.

20

- Speed is neither too fast nor too slow for conditions.
- Uses knowledge to make driving smoother and more economical.

Key #3: Keep Your Eyes Moving
- Scans mirrors frequently.
- Scans major and minor intersections before entry.
- Moves eyes at least every two seconds.
- Checks mirrors prior to slowing or stopping the vehicle.
- Avoids staring while evaluating relevant objects.

Key #4: Leave Yourself An Out
- Maintains proper space around the vehicle.
- Adjusts space to avoid unsafe intrusion by other drivers.
- When stopped, leaves appropriate space in front of vehicle.
- Consistently selects lanes to minimize danger and maximize space & visibility.
- Keeps up to date with current size and shape of space cushion.

Key #5: Make Sure They See You
- Seeks eye contact and communicates when conditions suggest the need.
- Effectively times use of turn indicators.
- Appropriate speed and communications when changing lanes
- Brakes early to activate brake lights.
- Vehicle positioning promotes seeing and being seen.

Note on Keys #1-#5: All of the bolded above primary key elements and sub-elements are bolded as they are either directly or indirectly associated to necessary driving behaviors as preventative actions to this crash.

Specifically, in part of the Smith-System Defensive Driver training that was conducted for the benefit of Chandler, there were PowerPoints that stated:

➢ *Anticipate situations that cause accidents*
➢ *Adjust driving speed to meet all hazards of weather, roads, traffic, and other existing conditions.*

The two aforesaid points were in addition to Chandler's Five Key Elements in the Smith-System to defensive driver training. Again, had Chandler applied his teachings, this crash would not have occurred.


5.5 NTSB-

It is widely recognized that CMV driving requires a special skill set and training than that of a commuter vehicle, a car. A CMV driver must know his limitations as to driver

21

fatigue, weather conditions, mechanical functionality and roadworthiness. It is therefore that Chairwoman Hersman of the NTSB stated the following as published in Transport Topics:

*Beyond technology and addressing fatigue, Hersman said truck drivers are held to a higher standard than the average driver, and they need to address safety issues accordingly. "What people in the trucking industry need to realize is they are professionals," she said. "They are professional drivers, and the standard of care and the level of expectations for them and their performance are higher."*

By virtue of Chandler's demonstrated skill set or lack thereof as a CMV driver, his highly suspected inattentive and careless driving clearly was the type of crash causing driving habits that caused Chairwoman Hersman to have made that statement. That too was the obvious opinion of Trooper Meyer whereas he wrote as the contributing factor to the crash as *"careless prohibited driving"*.

**5.6 Moth Effect-**

To elaborate on concerns as to Chandler's driving skill set as a "professional driver", Chandler testifies to not applying a general standard of care rule that has earned the phrase of "the moth effect".

Although the moth effect was not causative to the subject crash as there were no other vehicles in front of Chandler that he followed causing him to run off the travel portion of I-40, it is still a noteworthy issue to define Chandler's knowledge of CMV driving.

Chandler states in testimony regarding following lead taillights in foggy driving conditions: *"But it sure would have been nice if I could have looked ahead and seen some taillights and says, 'Hey, that's where I need to go' rather than what I'm fixing to do."* (TC; 222:6)

Applying the moth effect is a deadly practice for a CMV driver. If a CMV driver chooses to follow a lead car, a person likely not trained to the level of a CMV driver, the mistakes the car driver makes will likely have a chain reaction, often with deadly consequences.

**6.0 Opinions:**

Based upon the foregoing analysis, as a Commercial Motor Vehicle expert possessing nearly 25 years experience in the Transportation Industry and based upon what is good and safe practices in the Transportation Industry, I have come to form the following opinions as to the CMV crash that caused injury to Plaintiff which occurred at Interstate 40 Westbound, West Memphis, Arkansas, MM 281.6 on Tuesday, January 18, 2011 / approximately 5:48AM . I express these opinions with a reasonable degree of certainty and probability:

22

1. It is the undersigned's opinion that APAC clearly followed all prescribed regulatory requirements as to proper installation, maintenance and application to the advanced warning area in compliance with the MUTCD. As such APAC's compliance with all safety practices as prescribed was in no way contributory to the CMV crash that occurred on Tuesday, January 18, 2011, at approximately 5:48AM on Interstate 40 Westbound, West Memphis, Arkansas, MP 281.6

2. It is the undersigned's opinion that inattentive driving and/or fatigued driving was a contributing factor to the CMV crash that occurred on Tuesday, January 18, 2011, at approximately 5:48AM on Interstate 40 Westbound, West Memphis, Arkansas, MP 281.6

3. It is the undersigned's opinion that Chandler ignored the advanced warning area traffic control devices. The fact that Chandler obeyed the scalehouse sign requiring him to stop for the "OPEN" scalehouse, but suggests that the much larger illuminated and alternating flashing advisory sign warning of two right lanes being closed is highly questionable. This is in addition to the plethora of additional signs warning of the lane closures ahead. The signage placement and maintenance by APAC of all advanced warning area signage was in no way a contributing factor to the CMV crash that occurred on Tuesday, January 18, 2011, at approximately 5:48AM on Interstate 40 Westbound, West Memphis, Arkansas, MP 281.6

4. It is the undersigned's opinion that driving too fast for conditions was a contributing factor to the CMV crash that occurred on Tuesday, January 18, 2011, at approximately 5:48AM on Interstate 40 Westbound, West Memphis, Arkansas, MP 281.6

5. It is the undersigned's opinion that Chandler had unlawfully disobeyed both the yellow fogline intended to keep him in the travel lanes, and ignored or was unaware of the rumble strips when leaving the travel portion of I-40. Chandler's not utilizing the traffic control markings and aids was a contributing factor to the CMV crash that occurred on Tuesday, January 18, 2011, at approximately 5:48AM on Interstate 40 Westbound, West Memphis, Arkansas, MP 281.6

6. It is the undersigned's opinion that the only person that could have prevented this crash was that of Teddy Chandler. His actions and his actions alone are the only contributing factor to the CMV crash that occurred on Tuesday, January 18, 2011, at approximately 5:48AM on Interstate 40 Westbound, West Memphis, Arkansas, MP 281.6.

7. It is the undersigned's opinion that had Chandler applied his training techniques that he learned both at the time of his CDL issuance and during the ICC Driver Orientation Training, he would have not caused the subject crash. Chandler's failure to apply his learned knowledge was a contributing factor to the CMV crash that occurred on Tuesday, January 18, 2011, at approximately 5:48AM on Interstate 40 Westbound, West Memphis, Arkansas, MP 281.6.

8. It is the undersigned's opinion that Chandler's lack of understanding of the FMCSR as it pertains to his direct responsibilities regarding the 20 points of Required Knowledge, specifically *"safe operations regulations"* was willfully reckless and endangering of others. His failure to comply with this critical point

23

of Required Knowledge is nothing less than his own careless disregard for the rights and safety of others as he thought nothing of risking the motoring public on Tuesday, January 18, 2011, at approximately 5:48AM on Interstate 40 Westbound, West Memphis, Arkansas, MP 281.6

9. It is the undersigned's opinion that Chandler's lack of understanding of the FMCSR as it pertains to his direct responsibilities regarding the 20 points of Required Knowledge, specifically *"safety control systems"* was willfully reckless and endangering of others. His failure to comply with this critical point of Required Knowledge is nothing less than his own careless disregard for the rights and safety of others as he thought nothing of risking the motoring public on Tuesday, January 18, 2011, at approximately 5:48AM on Interstate 40 Westbound, West Memphis, Arkansas, MP 281.6

10. It is the undersigned's opinion that Chandler's lack of understanding of the FMCSR as it pertains to his direct responsibilities regarding the 20 points of Required Knowledge, specifically *"visual search"* was willfully reckless and endangering of others. His failure to comply with this critical point of Required Knowledge is nothing less than his own careless disregard for the rights and safety of others as he thought nothing of risking the motoring public on Tuesday, January 18, 2011, at approximately 5:48AM on Interstate 40 Westbound, West Memphis, Arkansas, MP 281.6

11. It is the undersigned's opinion that Chandler's lack of understanding of the FMCSR as it pertains to his direct responsibilities regarding the 20 points of Required Knowledge, specifically *"speed management"* was willfully reckless and endangering of others. His failure to comply with this critical point of Required Knowledge is nothing less than his own careless disregard for the rights and safety of others as he thought nothing of risking the motoring public on Tuesday, January 18, 2011, at approximately 5:48AM on Interstate 40 Westbound, West Memphis, Arkansas, MP 281.6

12. It is the undersigned's opinion that Chandler's lack of understanding of the FMCSR as it pertains to his direct responsibilities regarding the 20 points of Required Knowledge, specifically *"night operation"* was willfully reckless and endangering of others. His failure to comply with this critical point of Required Knowledge is nothing less than his own careless disregard for the rights and safety of others as he thought nothing of risking the motoring public on Tuesday, January 18, 2011, at approximately 5:48AM on Interstate 40 Westbound, West Memphis, Arkansas, MP 281.6

13. It is the undersigned's opinion that Chandler's lack of understanding of the FMCSR as it pertains to his direct responsibilities regarding the 20 points of Required Knowledge, specifically *"extreme driving conditions"* was willfully reckless and endangering of others. His failure to comply with this critical point of Required Knowledge is nothing less than his own careless disregard for the rights and safety of others as he thought nothing of risking the motoring public on Tuesday, January 18, 2011, at approximately 5:48AM on Interstate 40 Westbound, West Memphis, Arkansas, MP 281.6

14. It is the undersigned's opinion that Chandler's lack of understanding of the FMCSR as it pertains to his direct responsibilities regarding the 20 points of

24

Required Knowledge, specifically *"Hazard perceptions"* was willfully reckless and endangering of others. His failure to comply with this critical point of Required Knowledge is nothing less than his own careless disregard for the rights and safety of others as he thought nothing of risking the motoring public on Tuesday, January 18, 2011, at approximately 5:48AM on Interstate 40 Westbound, West Memphis, Arkansas, MP 281.6

15. It is the undersigned's opinion that Chandler's lack of understanding of the FMCSR as it pertains to his direct responsibilities regarding the 20 points of Required Knowledge, specifically *"emergency maneuvers"* was willfully reckless and endangering of others. His failure to comply with this critical point of Required Knowledge is nothing less than his own careless disregard for the rights and safety of others as he thought nothing of risking the motoring public on Tuesday, January 18, 2011, at approximately 5:48AM on Interstate 40 Westbound, West Memphis, Arkansas, MP 281.6

16. It is the undersigned's opinion that Chandler's lack of understanding of the FMCSR as it pertains to his direct responsibilities regarding the 20 points of Required Knowledge, specifically *"fatigue and awareness"* was willfully reckless and endangering of others. His failure to comply with this critical point of Required Knowledge is nothing less than his own careless disregard for the rights and safety of others as he thought nothing of risking the motoring public on Tuesday, January 18, 2011, at approximately 5:48AM on Interstate 40 Westbound, West Memphis, Arkansas, MP 281.6

17. It is the undersigned's opinion that Chandler unnecessarily and unfairly risked the rights and safety of others by his actions of how he operated his CMV in complete careless disregard for the Federal Motor Carrier **Safety** Regulations. His disregard for the safety regulations ignorance to the same, in spite of him considering himself a "professional" is a willful disregard to the rights and safety to others. Chandler's careless disregard was a contributing factor to the CMV crash that occurred on Tuesday, January 18, 2011, at approximately 5:48AM on Interstate 40 Westbound, West Memphis, Arkansas, MP 281.6

18. It is the undersigned that is in agreement with Trooper Meyer as to Chandler's *"careless prohibited driving"* causing the crash of subject on Tuesday, January 18, 2011, at approximately 5:48AM on Interstate 40 Westbound, West Memphis, Arkansas, MP 281.6.

19. It is the undersigned's opinion that Chandler's first position (before filing deposition) of observing that the *"flashing arrow sign on right side of road appeared. I [he] had to merge to far left lane because of lanes closure. All other lanes closed except for far left lane"* was the correct position. Later deposition testimony demands questionable credibility.

20. It is the undersigned's opinion that Chandler operated his CMV in a profit over safety modus operandi. This MO clearly was a contributing factor to the CMV crash that occurred on Tuesday, January 18, 2011, at approximately 5:48AM on Interstate 40 Westbound, West Memphis, Arkansas, MP 281.6

25

### 7.0 Conclusion:

The undersigned has nearly a 25-year career responding to and/or investigating in excess of 1,200 truck crashes of which a percentage were involved within heavy highway construction zones. In addition to a plethora of career experiences in and around highway construction zones, including but not limited to: supervising heavy highway construction and personally driving 100's of miles throughout highway construction zones in both CMV's and non-CDL cattle type trailers, this crash could have been prevented by one person and one person alone -- Mr. Chandler.

The undersigned's aforesaid opinion seems to mirror that of the only person on scene with crash investigation experience that is rendering an opinion, Trooper Meyer, an enforcement officer since 1992.

In deposition testimony Trooper Meyer's states the following of which truly represents the crux of the matter: A: "*I told him that this accident was basically nobody's fault but his client's. I really couldn't - - and I may have even said something to the effect of all the wrecks that I've worked in Crittenden County, this would have been the last one that I thought would ever be in a lawsuit.*" (SM; 170,6)

Again, clearly this crash could have been avoided by one person alone, Mr. Chandler.

### Documents Reviewed:

- ➢ Deposition Transcript of Teddy Chandler, w/ Exhibits (two volumes)
- ➢ Deposition Transcript of Trooper Shane William Meyer, w/ Exhibits
- ➢ Deposition Transcript of Paul Jeffrey Adams, w/ Exhibits
- ➢ Deposition Transcript of James W. Smith, w/ Exhibits
- ➢ Deposition Transcript of John Alford, w/ Exhibits
- ➢ Deposition Transcript of Max Watson, w/ Exhibits
- ➢ Plaintiff's Complaint
- ➢ Plaintiff's Amended Complaint
- ➢ CIA Photographs -- 1/21/2011
- ➢ Arkansas Uniform Motor Vehicle Collision Report
- ➢ Video Footages of I-40 Drive Thru of Advanced Warning Area and Construction Sire -- Thumb Drive
- ➢ Ride Along Video Footage 01F448F52011010916022301; 1/9/2011 5:02PM
- ➢ Payment Records from ICC to Chandler
- ➢ Driver Q-File -- Partial
- ➢ Independent Contractor Equipment and Service Augmentation Agreement
- ➢ ICC Pre-Employment Questionnaire
- ➢ Driver Status Sheets
- ➢ T. Chandler Driver Move History
- ➢ ICC – Notice of Contract Cancellation

26

- ➤ IMCG -- Accident Review Record
- ➤ Chandler -- Hand Written Post Crash Statement
- ➤ ICC Driver Orientation Program -- PowerPoint

References:

- Black's Law Dictionary; Ninth Edition
- MUTCD; 2003 Edition – 2009 Edition w/ Revision #1 & #2
- NATMI; Motor Fleet Safety Supervision, Principles and Practices, Page 15-1.
- Federal Motor Carrier Safety Regulations
- NHTSA -- Run Off-Road Crashes: An On-Scene Perspective
- Transport Topics; Chairwoman Hersman, NTSB 7/12/2010
- FMCSA -- Driver Distraction Post
- AHTD; Annual Average Daily Traffic Estimates for 2010/2011 (AHTD Web)
- Sun & Moon Data for One Day – US Naval Observatory
- Is the Moth Effect Real? Marc Green ATA; The Alert Driver, A Trucker's Guide to Sleep, Fatigue, and Rest in Our 24-Hour Society
- ByeAlert.com

As the sole author of this report, I reserve the right to change or amend my conclusions and opinions based on information that was not available to me at the time of this report writing. Should the need for such changes or amendments be necessary I will submit the same to the retaining counsel of this report.

Report By:

Scott L. Turner
President
Scott L. Turner Consulting, LLC

27